Argued December 2, 1959, reversed January 13, petition for
rehearing denied February 2, 1960

## SMITH *v.* CHIPMAN
348 P. 2d 441

*Eugene K. Richardson,* Newport, argued the cause
and filed the brief for appellant.

*Leo Levenson,* Portland, argued the cause for respondent. With him on the brief was Norman B. Kobin, Portland.

Before McAllister, Chief Justice, and Rossman, Perry and Redding, Justices.

ROSSMAN, J.

This is an appeal by the defendant, Laura Chipman, from a judgment in the amount of $5,125 which the circuit court entered in favor of the plaintiff, Bernice Smith, after a jury had returned a verdict in her favor in that sum. Of the awarded sum $125 was compensatory damages and $5,000 punitive damages. The action was based upon charges that (a) the defendant in July 1956 converted to her use personal property of the plaintiff which had a value of $125 and (b) the defendant's action was malicious, thereby subjecting her to the imposition of punitive damages. The answer, in addition to denying the charges of conversion and malice, alleged that (1) November 2, 1954, the plaintiff became the tenant at a monthly rental of $35 of a dwelling house which the defendant owned, (2) the plaintiff occupied the premises until July 1956 when $594 rent was in arrears and (3) July 8, 1956, the defendant seized the personal property described in the complaint in order to "compel plaintiff to pay to defendant the rental on the aforementioned real property, which was and is due and owing by plaintiff to defendant." The reply conceded the tenancy, the amount of rental which became payable and the amount in arrears ($594). Referring to the answer, the reply admitted that "defendant seized all the personal property alleged therein to compel plaintiff to pay defendant the rental due her."

Appellant's (defendant's) brief states:

"The question before the court in this case in a nutshell is: Did the landlord's common law right to distrain the goods of his tenant for non payment of rent exist in the State of Oregon on or about July 8, 1956."

The defendant, in appealing, presents three assignments of error, but since they submit the same issue we will consider them as one. The first challenges the trial judge's ruling which denied the defendant's motion for an involuntary nonsuit. The motion was based upon the ground that the defendant could lawfully distrain the personal property which her tenant, the plaintiff, had brought upon the rented premises. The second claims that error occurred when the trial judge instructed the jury that the defendant "had no lawful right to take plaintiff's personal property without her consent * * * and such conduct on the part of the defendant rendered her liable." The third assigns as error the trial judge's refusal to advise the jury that the defendant had a lawful right "to retain possession of said personal property as security for the payment of rent * * *."

The facts are simple. The defendant owned a dwelling house in Newport which she rented November 2, 1954, to the plaintiff at a monthly rental of $35. The plaintiff remained in possession of the property until July of 1956. In that period a total rental of $735 accrued but only $141 of it was paid. The last payment was made in 1955. Tuesday, July 10, 1956, in the early afternoon the defendant went to the house in question for the purpose of requesting the payment of rent, but found that the plaintiff was absent. She observed, however, that all of the plaintiff's belongings were in cartons which stood upon the floor of

one of the rooms. At that juncture the defendant took the cartons to a storage room which she possessed where she impounded them and locked the front door of the house by attaching a padlock to it. She testified that the plaintiff had not been in the house for some days. The plaintiff conceded that the period of her absence was at least a week, and possibly more. The water and electrical services had been shut off for some time.

The items of property in the cartons which the defendant seized consisted principally of apparel, bedding and cooking utensils. They were the property of the plaintiff and when the latter requested the defendant to release some of the apparel the defendant replied that she would not do so until the rent was paid. The plaintiff contends that the defendant's conduct constituted conversion of the property.

The defendant's brief states:

"The landlord's common law right to distrain the personal chattels of their tenants for non payment of rent had not been changed or abrogated by the statutes of the State of Oregon on or about July 8, 1956.

\*　　　\*　　　\*

"The landlord's common law right to distress for rent in arrears are compatible with the conditions of the people of the State of Oregon and the nature of their political institutions."

The plaintiff-respondent's brief states:

"Since 1859 the Oregon legislature must have considered the common law in respect to the right of distress as not adapted to our conditions and as obsolete, or impliedly repealed, not only by reason of the statutes exempting articles of great personal necessity from attachment and execution. ORS 29.140, ORS 23.160, but in the enactment in 1931

of a statute giving to apartment-house landlords, exclusively, a lien on the tenant's property. L. 1931 Ch. 212, p. 338; Laws 1933 ch 163, p. 204; O. C. 1935 Supp. Sec. 51 1401; OCLA 67-1501-1504."

Volume 3-4, Blackstone Commentaries, Lewis Edition, page 1024, defines distraint and describes its operation in the following passages:

"A fifth case in which the law allows a man to be his own avenger, or to minister redress to himself, is that of *distraining* cattle or goods for the non-payment of rent \* \* \* or distraining another's cattle *damage-feasant,* that is, doing damage or trespassing upon his land. The former intended for the benefit of landlords, to prevent tenants from secreting or withdrawing their effects to his prejudice; the latter arising from the necessity of the thing itself, as it might otherwise be impossible at a future time to ascertain whose cattle they were that committed the trespass or damage.

\* \* \*

"And first it is necessary to premise that a distress, *districtio,* is the taking a personal chattel out of the possession of the wrong-doer into the custody of the party injured, to procure a satisfaction for the wrong committed. 1. The most usual injury for which a distress may be taken is that of non-payment of rent. It was observed in the former book that distresses were incident by the common law to every *rent-service,* and by particular reservation to *rent-charges* also \* \* \*. So that now we may lay it down as a universal principle, that a distress may be taken for any kind of rent in arrear; the detaining whereof beyond the day of payment is an injury to him that is entitled to receive it. \* \* \* 4. Another injury for which distresses may be taken is where a man finds beasts of a stranger wandering in his grounds *damage-feasant*; that is, doing him hurt or damage by treading down his grass or the like; in which

case the owner of the soil may distrain them till satisfaction be made him for the injury he has thereby sustained. * * *

"Secondly, as to the things which may be distrained, or taken in distress, we may lay it down as a general rule, that all chattels personal are liable to be distrained, unless particularly protected or exempted. Instead therefore of mentioning what things are distrainable, it will be easier to recount those which are not so, with the reason of their particular exemptions. * * * But, generally speaking, whatever goods and chattels the landlord finds upon the premises, whether they in fact belong to the tenant or a stranger, are distrainable by him for rent * * *. There are also other things privileged by the ancient common law; as a man's tools and utensils of his trade, the axe of a carpenter, the books of a scholar, and the like: which are said to be privileged for the sake of the public, because the taking them away would disable the owner from serving the commonwealth in his station. * * *

"In the first place then, all distresses must be made *by day*, unless in the case of *damage feasant*; an exception being there allowed, lest the beasts should escape before they are taken. * * *

"When the distress is thus taken, the next consideration is the disposal of it. For which purpose the things distrained must in the first place be carried to some pound, and there impounded by the taker. * * *"

It will be noticed from the passages just quoted that the conditions which are generally essential to a distraint, unless the latter is of the damage-feasant type, are (1) a landlord-tenant relationship, (2) rent in arrears, (3) the seizure of personal property by the landlord which he finds upon the premises provided

the items are not exempt from distraint and (4) the deposit of the seized personal property in a pound where it will await the payment of the overdue rent.

We will now take notice of Oregon legislative enactments and decisions of this court which indicate whether or not Oregon landlords possessed the right of distraint at the time in question.

Laws of Oregon 1843-9, page 100, provides:

"All the statute laws of Iowa Territory, passed at the first session of the Legislative Assembly of said Territory, and not of a local character, and not incompatible with the condition and circumstances of this country, shall be the law of this government, unless otherwise modified; and the common law of England and principles of equity, not modified by the statutes of Iowa or of this government, and not incompatible with its principles, shall constitute a part of the law of this land."

Article XVIII, § 7, Constitution of Oregon, states:

"All laws in force in the territory of Oregon when this constitution takes effect, and consistent therewith, shall continue in force until altered or repealed."

We take the following from Judge Carey's History of Oregon, page 502:

"The various and successive provisional governments had on three separate occasions adopted bodily the statutes of Iowa to be the law of Oregon. Each of these acts of the voluntary political organization of the settlers had alluded specifically to a certain compilation of the Iowa territorial statutes printed in 1839, being the statute laws enacted at the first session of the legislative assembly of that territory. This book was bound in blue boards and it came to be popularly known in Oregon during the years from 1843 to 1849 by familiar desig-

nation as the Blue Book. Now, when the Territory of Oregon was created by Congress the first territorial legislative assembly, notwithstanding the provision in the organic act that kept alive all existing laws of the provisional government, deemed it necessary again to adopt the Iowa statutes, and proceeded to do so by an enactment that referred to a later compilation of the Iowa statutes, printed in 1843, being the revised statutes of the Territory of Iowa, contained in a more portly blue volume. * * *"

■ Accordingly, the common law of England became the law of Oregon unless (1) it was modified by a statute or statutes enacted in Oregon or Iowa prior to the adoption of the law of the provisional government just quoted or (2) was "not compatible with" the principles of the government established by the provisional government or (3) was inconsistent with the Oregon Constitution which was written in 1857. Principles of the common law which met those tests became the law of this jurisdiction "until altered or repealed." The plaintiff makes no contention that the common law remedy of distress was modified by any statute enacted in Iowa or Oregon prior to Laws of Oregon 1843-9. She calls attention, however, to the adoption of legislation in both jurisdictions which exempted from the levy of a writ of execution some prescribed items of the judgment debtor's personal property. Those enactments did not affect the remedy of distress. Therefore, the problem which we must resolve is whether distress was compatible with the principles of Oregon government and consistent with the Oregon Constitution. No one claims that the remedy of distress impinges upon any principle of the Oregon Constitution and hence we can reduce the issue submitted by the appeal to the single inquiry as to whether or

not distress is compatible with the principles of our system of Oregon government. Obviously, that question must be resolved by taking note of the case law as announced by this court and the statutory law as enacted by our legislature.

Upon that score the plaintiff contends:

"* * * the medieval right of distress or 'self help' was found to be invidious and that it was not recognized in Oregon as it existed at common law. * * *"

Particularly, she claims that (1) the right was not adapted to the conditions of this jurisdiction, (2) the adoption of the statute which gives the creditor a right to attach for the recovery of overdue rent and other debts was a substitute for distraint, and (3) enactment of our statute which gave to apartment house owners a lien upon the tenant's property indicates that other landlords, such as this defendant, had no lien and thus distress became obsolete.

■ We do not believe that the adoption of the statute which created the non-common law remedy of attachment repealed or displaced the remedy of distress. The two remedies are obviously dissimilar. The one is of ancient common law origin. The other had its creation in legislative halls. The one is of the self-help type; the other requires the filing of a law suit. The fact that a landlord, upon instituting an action against a tenant for overdue rent, may attach the tenant's property possibly causes landlords to prefer that remedy to distress when the sums are large; but the creation of the remedy left unimpaired distress, as we shall presently see.

*Hall v. Marshall*, 145 Or 221, 27 P2d 193, is material in the consideration of this case for two rea-

sons. First, it held that distress for damage-feasant is available in this state. Second, it rejected as untenable an argument that the enactment of a statute (O C 1930, §§ 38-108 and 38-113) which rendered subject to distress for damage-feasant "horse, mare, gelding, mule, ass, jenny, foal, bull, stag, cow, ox, steer, heifer, calf or goat" necessarily implied that distress was not available if the damage was done by sheep. The argument just mentioned, which was rejected, is not fundamentally different from the one presented in the case at bar wherein the plaintiff claims that because a 1931 enactment of our legislature granted to apartment house owners the right to seize the personal property of rent-delinquent tenants all other landlords are precluded from seizing the personal property of their non-paying tenants. *Hall v. Marshall* was a suit to foreclose two chattel mortgages which described a band of sheep. A rancher by the name of Dunn claimed a lien upon the sheep by virtue of a distress to which he subjected them when they entered his premises and partook of water and pasturage. The plaintiff mortgagee contended that since O C 1930, §§ 38-108 and 38-113, although listing the above quoted category of animals as subject to distress for damage feasant, omitted sheep, therefore, sheep were not subject to distress. Our decision said:

> "Plaintiff contends that because sheep are not mentioned in section 38-108 and because the remedy of distress is given by section 38-113 for only such animals as are mentioned in section 38-108, and sheep not being so mentioned, the remedy of distress does not exist for sheep trespassing upon real property * * *.

> "We do not think that the statute referred to was intended to limit the remedy of distress damage feasant only to the animals enumerated in the

statute. 'A distress,' it is said, 'is the taking of a personal chattel without legal process from the possession of a wrongdoer into the hands of the party aggrieved, as a pledge for the redress of an injury, the performance of a duty, or the satisfaction of a demand.' Bradby on Distress 1. It is said to be founded on the instinct and principle of self-help. 3 Street, Foundations of Legal Liability, p. 278. * * *"

The decision held that "the principles of the common law giving the remedy of distress * * * are applicable to beasts doing damage on the lands possessed by another." The decree of the circuit court which held that Dunn was entitled to a lien upon the sheep for caring for and feeding them during the period in which they were upon his premises was affirmed.

That decision is a direct holding that the remedy of distress is not incompatible with the principles employed in this jurisdiction. It took note of three sections of Oregon Code 1930 which made provision for distress damage feasant and then granted the owner of the premises, into which the sheep had trespassed, relief under the common law principles of distress. The decision said:

"In the enactment of this section it is plain that the legislature was of the opinion that the principles of the common law granting to the owner or possessor of lands the right to distrain animals doing damage on the lands is adapted to our conditions and hence should become a part of the body of the law of this state for that reason and, it being the law, the reason for its application to sheep doing damage is as strong as if it were some other kind of animals taken damage feasant."

The foregoing is not the only indication which we have as to whether the remedy of distraint is suitable

to the conditions of this state. In 1913 through the enactment of Oregon Laws 1913, chapter 317, now in part ORS 87.525 and 87.530, this state gave a lien to inn and hotel keepers upon the property of non-paying guests. The statute said:

> "The keeper of any inn or hotel  *  *  * shall have a lien on the baggage, clothing, jewelry and other property brought in to such inn or hotel belonging to or under control of his guest or boarders for the proper charges due him  *  *  * and said innkeeper or hotel keeper shall have the right to retain and hold possession of such baggage  *  *  * until the amount of such charges be paid  *  *  *."

That act also provided:

> "The inn keeper or hotel keeper shall retain such baggage, clothing, jewelry and other property upon which he has a lien as above mentioned, for a period of 60 days, at the expiration of which time, if such lien is not satisfied, he may proceed to sell such baggage, clothing  *  *  *."

It will be noticed that apart from non-essentials the innkeeper's statute is not unlike the remedy of distress as described by Blackstone. In view of the language of Laws of Oregon 1843-9 and Article XVIII, § 7, Constitution of Oregon, both previously quoted, it seems reasonable to conclude that the innkeeper's statute reduced to statutory form a rule of the common law. In any event, the enactment of that statute was clearly a legislative finding that the rule of the common law which permitted innkeepers to distress the personal property of their nonpaying guests was suitable to the needs and conditions of this state.

With the multiplication of apartment houses in this state the 1931 Legislative Assembly enacted Oregon Laws 1931, chapter 212, page 338, which conferred

upon apartment house proprietors a right similar to that which innkeepers possessed. We have noticed that our laws recognized in innkeepers the right to distress the property of non-paying guests which had been brought to the hotel. The apartment house statute authorizes proprietors of those establishments to seize and hold "all personal property owned by a tenant or occupant legally responsible for rent, brought upon the leased premises." The next words state that the purpose of the seizure is "to secure the payment of rent, and such advances as may be made on behalf of such tenant." The statute granted the lien resulting from the seizure "priority over all other liens" and over all other claims except (1) those for taxes, (2) recorded chattel mortgages and (3) unpaid sums if the property was purchased upon conditional sales contract. The act requires "no writing, recording nor filing" to create the lien. If the unpaid rent is not discharged within 30 days the apartment house proprietor may sell the property in the manner prescribed in the act. It will be noticed that this statute is in harmony with the essentials of distress as outlined in the passages which we quoted from Blackstone. The 1931 act subjected all of the tenant's personal property in the leased apartment to seizure. Oregon Laws 1933, chapter 163, exempted from seizure wearing apparel. The apartment house statute surely recognized that distress, although not so termed in the statute, was suitable to the needs and conditions of the state. The fact that the statute did not employ the word "distress" was immaterial.

Oregon Laws 1957, chapter 684, page 1192, materially enlarged the scope of the remedy afforded by the apartment house statute of which we have just taken notice. This new enactment is now ORS 87.535

through 87.551. Its terms are akin to those of the innkeepers and apartment house owners' statutes. It states:

"* * * every landlord shall have a lien upon all personal property, except wearing apparel * * * owned by a tenant or occupant legally responsible for rent, brought upon the leased premises, to secure the payment of rent * * *. The landlord may retain all such property during the existence of the lien. The lien shall have priority over all other liens and claims except * * *. No writing, recording nor filing shall be necessary to create such lien * * *."

Although the 1957 act was not enacted until after this action had been instituted, nevertheless it shows that the legislature deemed that distress of the very kind which the defendant instituted upon the property of the plaintiff is compatible with the needs and usages of this state.

In view of the foregoing, we can not say that distress is alien to the needs, usages, practices and sense of justice of the people of this state. It is true that the innkeepers, apartment house owners and general landlords statutes do not employ the words distress and distraint, but their omission from that legislation is inconsequential. It may be that those words had acquired, through the centuries, an ancient flavor which the people of this generation preferred to avoid, but it is impossible to escape the conclusion that the remedy which those words designated had commended itself to the good sense of the lawmaker with ever-increasing approval.

The fact that the Restatement of the Law includes within the volume entitled Security liens of the character with which preceding paragraphs of this opinion are concerned further establishes that distress is

not alien to the needs of this day. See Restatement of the Law, Security, § 61 (c), (h), (i) and § 63.

Nothing of a practical value would be gained by analyzing one by one the decisions of other jurisdictions which determined whether or not the common law remedy of distress was available within the particular jurisdiction. Most of the decisions were confronted with circumstances materially different from those which we face. The fact, however, that most jurisdictions employ distress, whether by virtue of the common law or through legislation, indicates that the remedy is not foreign to but consonant with today's sense of justice.

However, lest it be assumed that the early legislation of the Oregon settler which is quoted in a preceding paragraph is a novelty, we mention *Dutcher v. Culver,* 24 Minn 584, which quotes some of the legislation of pioneer Minnesota. The pioneer Minnesotan did not resort to early Iowa legislation, like the early settler of this state, but invoked "the laws in force in the territory of Wisconsin at the date of the admission of the State of Wisconsin." In holding that distress was available in Minnesota, the court declared that it was not incompatible with the organic act.

*Bickel v. Polaris Investment Company,* 155 Fed Supp 411, decided in 1957 by the federal district court, sitting in one of our newer states, Alaska, is of more than passing interest. It took note of the durable qualities possessed by the lien created by remedy of distress. That lien, according to the decision, is not rendered null and void by the provision of the bankruptcy act which speaks of liens obtained by legal process within four months of the filing of the petition in bankruptcy. The plaintiff in that case, as trustee in bankruptcy, sought to recover the value

of personal property which he claimed the bankrupt had transferred to the defendant within four months of the filing of the bankruptcy petition. Upon pre-trial it was admitted that the property, consisting of office furniture and merchandise, was seized by defendant landlord within four months of the filing of the petition in bankruptcy upon distraint for past-due rent of the premises. In holding the distress lien valid, the decision declared:

"We have no statutory landlord's lien in Alaska, nor any specific provision by statute for distress warrant proceedings by a landlord, as provided in some states. However, Sec. 2-1-2, A.C.L.A. 1949, provides that so much of the common law as is applicable and not inconsistent with the Constitution of the United States or with any law passed by Congress or the Legislature of Alaska is adopted and declared to be the law in the Territory. And Sec. 22-1-3, A.C.L.A. 1949, provides that in addition to the remedy provided to a landlord for recovery of rent accrued by action, landlords shall not be deprived of any other legal remedy for the recovery of their rents, 'whether secured to them by their leases or provided by law.'"

We pause to observe that ORS 91.220 (3) employs the same words as those last quoted. Going, on the decision stated:

"Distress for rent in arrears is an ancient common law remedy which allows a landlord to go on the demised premises and seize property of the tenant therein for rent and hold it until the rent is paid. * * *

"The decisions above enumerated make no distinction between a statutory landlord's lien and the right of distress or distraint recognized at common law. * * * To quote from the West Side Paper Co. case, supra [162 F. 111],

" 'Distress for rent in arrear, is one of the most

ancient, as well as "one of the most efficient of the landlord's remedies for the collection of rent." It is in most of our states, as it was at common law, a right sui generis, belonging to the landlord whenever the relation of landlord and tenant existed. It appears to have been abolished in a few of the states, and in most of them its exercise has been regulated by statute. Its essential characteristics are, however, for the most part the same as existed at common law.'

\*      \*      \*

"The right of distress by actual seizure of possession of the tenant's property upon demised premises must therefore be recognized; and it must further be held that such right is not void nor divested by Sec. 67, sub. f of the Bankruptcy Act."

■ We believe that it is clear that the remedy of distress became a part of the law of Oregon as a result of this jurisdiction's adoption of compatible common law. The enactment of our apartment house statute did not, in our belief, discard the remedy of distress. The adoption of the innkeepers, apartment house owners and general landlords statutes merely gave to our laws upon those subjects the clarity, certainty and completeness which codification sometimes imparts to a body of law.

The assignments of error are sustained.

The challenged judgment is reversed.